Slip Op. 16 - 108

UNITED STATES COURT OF INTERNATIONAL TRADE

- - - - - - - - - - - - - - - - - - - -x
AK STEEL CORPORATION, ALLEGHENY LUDLUM,    :
LLC d/b/a ATI FLAT ROLLED PRODUCTS,
and UNITED STEELWORKERS,                   :

                                           :

                      Plaintiffs,          :

                                           :

              v.                           :

                                           :
UNITED STATES INTERNATIONAL TRADE               Consolidated
COMMISSION,                                :    Court No. 14-00220
                                                <u>PUBLIC</u> <u>VERSION</u>
                      Defendant,           :

                                           :

              -and-                        :

                                           :
THYSSENKRUPP ELECTRICAL STEEL GmbH, ABB     :
INC., NIPPON STEEL & SUMITOMO METAL
CORPORATION, and JFE STEEL CORPORATION,     :

                                           :

              Intervenor-Defendants.       :
- - - - - - - - - - - - - - - - - - - -x

<u>Opinion & Order</u>

[Plaintiffs' motion for judgment on agency record,
 contesting negative material-injury determinations
 based thereon, denied;  action dismissed.]


                              Decided: November 23, 2016

     <u>David A. Hartquist</u>, <u>John M. Herrmann</u>, <u>Grace W. Kim</u>, and
<u>Benjamin Blase Caryl</u>, <u>Kelley Drye & Warren LLP</u>, Washington, D.C.,
for the plaintiffs.

     <u>Dominic L. Bianchi</u>, General Counsel, <u>Andrea C. Casson</u>,
Assistant General Counsel for Litigation, and <u>Rhonda M. Hughes</u>,
Attorney-Advisor, Office of General Counsel, U.S. International
Trade Commission, Washington, D.C., for the defendant.

J. Kevin Horgan and Marc E. Montalbine, deKieffer & Horgan, PLLC, Washington, D.C., for intervenor-defendant ThyssenKrupp Electrical Steel GmbH.

John D. Greenwald and Ulrika K. Swanson, Cassidy Levy Kent (USA) LLP, Washington, D.C., for intervenor-defendant ABB Inc.

Donald Harrison, Gibson, Dunn & Crutcher LLP, Washington, D.C., for intervenor-defendant Nippon Steel & Sumitomo Metal Corporation.

Robert Huey, Gregory Husisian, David Hickerson, and Morgan J. West, Foley Lardner LLP, Washington, D.C., for intervenor-defendant JFE Steel Corporation.

AQUILINO, Senior Judge:   This consolidated action challenges the final negative determinations of the United States International Trade Commission ("ITC" or "Commission") that imported grain oriented electrical steel ("GOES") did not materially injure, or threaten material injury to, the U.S. domestic industry.  See GOES From Germany, Japan, and Poland, Inv. Nos. 731-TA-1233, -1234, -1236 (USITC Pub. 4491, Sept. 2014), and GOES From China, Czech Republic, South Korea, and Russia, Inv. Nos. 701-TA-505 and 731-TA-1231, -1232, -1235, -1237 (USITC Pub. 4500, Nov. 2014), published respectively at 79 Fed.Reg. 54744 (Sept. 12, 2014) and 79 Fed.Reg. 66739 (Nov. 10, 2014), as further articulated in Confidential Views of the Commission ("Views") and ITC Final Proprietary Staff Report dated August 14, 2014 (incorporating revisions of Aug. 20, 2014) ("Staff Report").

According to the agency record developed, that domestic industry is comprised of two manufacturers, AK Steel Corporation and Allegheny Ludlum, LLC, which have filed complaints in this consolidated action pursuant to 19 U.S.C. §1516a(a)(2)(A)(i)(I) and (B)(ii) and 28 U.S.C. §1581(c) along with the United Steelworkers. Together as parties plaintiff, they have interposed a motion for judgment on that record in accordance with USCIT Rule 56.2.

I

The papers filed in support of that motion (and in opposition thereto) show that GOES is a flat-rolled alloy steel product with a chemistry that facilitates the formation of large grains during production that align uniformly in the rolling direction (lengthwise) of steel sheet.  Such grains enable the steel to conduct a magnetic field with a high degree of efficiency, relative to other steels.

GOES is particularly suitable for the manufacture of cores for transformers used in connection with the generation and transmission of electricity.  It is produced with different levels of "permeability", i.e., the degree of efficiency with which the steel can conduct a magnetic field.

"Conventional" grades of GOES have smaller, but less precisely oriented, grains.  They are typically referred to by

grades established by the American Iron and Steel Institute that range from M-2 to M-6, with M-2 being the thinnest gauge (0.007 inches or 0.18 millimeters ("mm")) and most efficient material, and M-6 being the thickest gauge (0.0138 inches or 0.35 mm) and least efficient.

"High-permeability" GOES has larger, more precisely oriented, grains that result in greater efficiencies (lower operating losses) relative to conventional grades. High-permeability GOES may also be subjected to certain surface treatments (known as domain refining) that further enhance efficiency.

AK Steel produces both conventional and high-permeability grades. Allegheny Ludlum produces conventional grades and was working in 2013 to develop the capacity to produce high-permeability GOES in commercial quantities. They concurrently filed antidumping- and countervailing- duty petitions with the International Trade Administration, U.S. Department of Commerce ("ITA") and the Commission, alleging that (1) imports of GOES from China, the Czech Republic, Germany, Japan, Korea, Poland and Russia were being sold in the United States at less than fair value; (2) manufacturers, producers or exporters of GOES in China were receiving countervailable subsidies; and (3) such imports were

materially injuring and threatening to injure the domestic GOES industry.[1]

Preliminarily, the Commission determined that there was a reasonable indication that the U.S. industry was materially injured by reason of imports of GOES from the seven subject countries.  See GOES from China, Czech Republic, Germany, Japan, Korea, Poland, and Russia, Inv. Nos. 701-TA-505 and 731-TA-1231-1237 (Prelim.), USITC Pub. 4439 (Nov. 2013), PDoc 91. Concurrently, ITA determined that imports of GOES from each of those countries were being sold at "less than fair value" ("LTFV")[2]

---

[1]  Upon receipt of such petition(s), ITC's role is to determine whether material injury or threat of such injury to the domestic industry is indeed the case by reason of imported sales of subject merchandise or the likelihood of such sales. 19 U.S.C. §1673d(b)(1).  See, e.g., Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed.Cir. 1997).  "[B]y reason of" subject imports means "not by reason of a minimal or tangential contribution to material harm caused by" such imports.  Mittal Steel Point Lisas Ltd. v. United States, 542 F.3d 867, 873 (Fed.Cir. 2008), quoting id.  The Commission evaluates the volume of subject imports, their effect upon prices in the U.S. market for the domestic like product, and their impact on domestic producers' "production operations" in the context of the U.S. market.  19 U.S.C. §1677(7)(B)(i).

[2]  Plaintiffs' papers emphasize that ITA's final LTFV margins ranged from 3.68% for subject merchandise from the Republic of Korea to 241.91% for such merchandise from Germany. See GOES From the People's Republic of China: Final Determination of Sales at LTFV, 79 Fed.Reg. 59226, 59227 (Dep't Commerce Oct. 1, 2014); GOES From the Republic of Korea: Final Determination of Sales at LTFV, 79 Fed.Reg. 59224, 59225 (Dep't Commerce Oct. 1, 2014); GOES
(continued...)

within the meaning of section 733(b) of the Tariff Act of 1930, as amended, 19 U.S.C. §1673b(b).

For the final phase, ITC determined that there had been price underselling of subject merchandise in the United States during the period of investigation ("POI"), which the parties do not dispute, but the Commission's final determination, by a vote of 5 to 1, was that underselling did not have significant adverse price effects during the POI.  See Views at 35.

That is, after consideration and analysis of the statutory factors of volume of GOES, domestic and imported, and the price effects of the subject imports, as set forth in their Views, pp. 26-41, the majority of commissioners found that most of the industry's trade, employment, and financial indicators deteriorated over the POI due to a combination of output-related (e g., loss of

---

[2]   (...continued)
From the Russian Federation: Final Determination of Sales at LTFV and Final Affirmative Determination of Critical Circumstances, 79 Fed.Reg. 59223, 59223 (Dep't Commerce Oct. 1, 2014); GOES From the People's Republic of China: Final Affirmative Countervailing Duty Determination, 79 Fed.Reg. 59221, 59222 (Dep't Commerce Oct. 1, 2014); GOES From the Czech Republic: Final Determination of Sales at LTFV and Final Affirmative Determination of Critical Circumstances, 79 Fed.Reg. 58324, 58325 (Dep't Commerce Sept. 29, 2014); GOES From Germany, Japan, and Poland: Final Determinations of Sales at LTFV and Certain Final Affirmative Determination of Critical Circumstances, 79 Fed.Reg. 42501, 42502 (Dep't Commerce July 22, 2014).

export shipments, higher unit costs due to less production) and adverse revenue effects (i.e., reduced prices due to lower raw materials costs, unused capacity, and intra-industry competition). See Views at 42-43. They concluded, however, that those conditions were due to the decline in exports, resulting in underutilized capacity and more intense competition over market share, and that subject imports "did not take significant market share away from the domestic industry and also did not have significant price effects". Id. at 42. Because the domestic industry's total capacity remained the same throughout the POI and also because its market share remained essentially stable while domestic shipments increased, ITC did not find the domestic industry to have been materially injured by reason of the subject imports. See id.

Recognizing the existence of potential differences between the industries in the subject countries (especially between Japan and the others), ITC found reasonable overlap of competition among subject imports from all seven, and between subject imports from each country and the domestic like product; therefore, it exercised its discretion to cumulate subject imports from all of them. See id. at 47. Based thereon, it found no threat of material injury by reason of subject imports, as it found no record evidence that the trending increase in subject import volume and

market share (and the reasons therefor) would change in the imminent future.  It also found no evidence on the record that any increase in subject imports would likely affect the domestic industry adversely in the imminent future, inasmuch as increasing imports had not adversely affected the domestic industry, and that the increasing demand over the POI and the conditions of competition in the U.S. market were unlikely to change appreciably (from the perspective of the time of ITC's investigation).  See id. at 48-49.

        ITC also found that capacity in the cumulated subject countries, although high both absolutely and relative to apparent U.S. consumption, increased over the POI and was projected to increase further.  Unused capacity was greater in interim 2013 than in interim 2014, and was projected to decline further in 2014 and further still in 2015.  Production increased over the period and was expected to increase in 2014 and 2015.  See id. at 49.  The Commission noted that a rather high portion of the aggregate production of GOES in the subject countries was used to meet their respective home markets' demand.  Shipments to the home markets increased over the period, which ITC expected to continue to increase.  Exports to other markets increased between 2011 and 2013, and were projected to increase in the future as well.  The

ratio of subject export shipments to the United States as a share of total shipments was steady throughout the period and was projected to remain so in the future.

ITC found that the data indicated the United States is not a principal export market for the cumulated subject industries. In view of the subject industries' projection of increasing shipments to the home markets and exports to other countries and their very limited reliance on the U.S. export market, the Commission found that significantly increased imports of the subject merchandise into the United States were not likely in the then-imminent future. Although ITC recognized that U.S. prices for GOES have been and will likely continue to be higher than prices in other markets, it indicated that this is not a factor that led the subject industries to direct an appreciably larger share of their export shipments to the United States from 2011 to 2013, and there was, at the time, no indication in the record that this is likely to change, i.e., even if subject imports from the cumulated subject countries were to increase, ITC did not find that any such increase would likely threaten material injury to the domestic industry given that the significance of the volume of subject imports did not cause material injury to the domestic industry over the POI. See Views at 49-50.

The Commission recognized that China ("PRC") imposed antidumping duties on GOES from Russia that became effective in 2010, but it emphasized that those duties were already in effect throughout the POI.  Also, while the Indian Steel Ministry was reported to have effectively banned imports of low-grade electrical steel in June 2011, the record did not indicate that such restriction resulted in diverting a volume of subject imports to the United States that materially injured the domestic industry during the period, nor was there any indication that this would change in the imminent future.  See id. at 51.  U.S. importers' inventories also fell over the POI, and although inventories of the subject merchandise held in the subject countries increased from 2011 to 2013, they were also projected to decline in the future. See id.

With regard to likely price effects, ITC found that, notwithstanding prevalent underselling, the subject imports did not have a significant adverse effect on prices for the domestic like product and that the domestic industry was therefore not materially injured by reason thereof.  See id. at 52.  ITC also found that, while some continued increase in subject import volume might occur in the imminent future, any such increase would likely not be significant nor be sufficient to have any adverse effects on the

domestic industry because imports of the subject merchandise were unlikely to enter at prices that would be likely to have a significant depressing or suppressing effect on domestic prices or to increase demand for more imports.  See id.  Moreover, having found no significant causal relationship between the subject imports and the domestic industry's performance during the POI, notwithstanding the domestic industry's declines in performance and operating income levels, the Commission had little reason to believe that any further deterioration of the condition of the domestic industry would be "by reason of" the subject imports in the imminent future.  See id.  ITC also found that subject imports had not had significant actual or potential negative effects on the existing development and production efforts of the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product.  See id. at 53.

II

The court necessarily has perused plaintiffs' submissions contesting ITC's determinations as well as those filed by the intervenor-defendants in support thereof.  The content quality of all the papers is such as to obviate the burdening of the parties with oral argument, and the motion therefor can be, and it hereby is, denied.  Moreover, the papers contain business confidential

information that need not be recited or referred to herein, save two "dramatic" events that occurred during the period of investigation.  <u>See</u> Opposition of intervenor-defendants JFE Steel Corporation and Nippon Steel & Sumitomo Metal Corporation ("JFE/NS&SM") at 3-4.

A

Judicial review examines whether a determination is supported by substantial evidence on the administrative record and is in accordance with law, which necessarily frames the issues. <u>See</u> 19 U.S.C. §1516a(b)(1)(B)(i).  If the record contains "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion"[3], taking into account the entire record, including whatever "fairly detracts", then the determination must be sustained.  <u>E.g.</u>, <u>Atlantic Sugar, Ltd. v. United States</u>, 744 F.2d 1556, 1562 (Fed.Cir. 1984).  If an agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action, including a rational connection between the facts found and the choice made"[4], that is sufficient, for "two inconsistent conclusions from the evidence does not prevent an administrative

---

[3]    <u>Consolidated Edison Co. v. NLRB</u>, 305 U.S. 197, 229 (1938).

[4]    <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co</u>., 463 U.S. 29, 43 (1983)(internal quotation marks deleted).

agency's finding from being supported by substantial evidence." Consolo v. Fed. Mar. Comm'n, 383 U.S. 607, 620 (1966).

ITC is also presumed to have considered all of the information in the administrative record. E.g., Granges Metallverken AB v. United States, 13 CIT 471, 479, 716 F.Supp. 17, 24 (1989). In other words, even if the record contains some evidence to which a complainant can point that tends to detract from an administrative conclusion, that does not, necessarily, render the conclusion unreasonable. E.g., Atlantic Sugar, 744 F.2d at 1563.

(i)

The plaintiffs first contend ITC's price effects analysis is not supported by substantial evidence on the record. The relevant statute requires consideration of whether (1) "there has been significant price underselling by the imported merchandise relative to the price of products manufactured in the United States" and (2) whether "the effects of subject imports have depressed prices, or prevented price increases that otherwise would have occurred, to a significant degree". 19 U.S.C. §1677(7)(C)(ii). The plaintiffs argue that the price effects analysis is undermined by the fact that ITC merely acknowledged the "direct importer" data but otherwise ignored them and relied only upon the "traditional"

pricing data.  <u>Compare</u> Plaintiffs' Memorandum of Law at 21-23 <u>with</u> <u>Views</u> at 35-37.  They claim it was erroneous for the agency not to have considered the direct importer data "in tandem" with the "traditional" data, and they tabulate those record data on page 23 of their brief, referencing <u>Staff Report</u>, V-9 to V-16 & Appx. D at D-6 to D-15, CDoc 254.  <u>See</u> <u>also</u> Plaintiffs' Reply, p. 7.

        The <u>Views</u> indicate that, while those data do indicate that subject imports were priced lower than the domestic like product in 17 of 30 comparisons for imports from Japan, 25 of 28 comparisons for imports from Poland, and seven of eight comparisons for imports from Russia, ConfRec at D-3 to D-4, PubRec at D-3, they already acknowledged that lower prices are prevalent in the price comparisons.  Moreover, for the highest volume of shipments of U.S.-produced product, *4b*, the incidence of higher and lower prices is mixed. <u>See</u> CR/PR, Table D-5. The volumes of imports involved in these comparisons are quite small.  When compared to the subject imports that are not directly imported by end users, those few direct purchases could not have led the prices of the domestic like product downward.  <u>Views</u> at 40 n. 150, referencing Appendix D to the <u>Staff Report</u>.

        The plaintiffs contend that the percent of total subject imports represented by the direct importer data volume can hardly

be characterized as "quite small" given that ITC acknowledged the

"significance" of the percentages as compared with shipments of

subject merchandise from the U.S. producers and from Japan, Poland

and Russia; that the direct importer data account for a sizeable

percent of the total volume of pricing data on the subject

imports[5]; that ITC has found significant injurious effects in

several recent investigations involving even lower U.S. shipments

of imports[6]; and that "quite small" is "directly at odds" with

ITC's findings that the direct importer data accounted for sizeable

percentages of total reported subject imports from Japan, Poland,

and Russia during the POI.  Plaintiffs' Memorandum of Law at 31,

referencing <u>Views</u> at 32 n. 116.  Furthermore, the plaintiffs

contend their tabulation confirms that the volume of the direct

---

[5]  <u>I.e.</u>, total subject import volume in Appendix D plus
total subject import volume reported in Section V.  <u>See</u> Plaintiffs'
Memorandum of Law at 30 & n. 32.

[6]  <u>See id</u>. at 31, referencing <u>Calcium Hypochlorite From the
PRC</u>, Inv. Nos. 701-TA-510 and 731-TA-1245 (Final), USITC Pub. 4515
(Jan. 2015) p. 17 ("[t]he pricing data accounted for approximately
. . . 21.3 percent of subject imports in 2013, with lower coverage
for subject imports in other years of the POI"); <u>Multilayered Wood
Flooring From the PRC</u>, Inv. Nos. 701-TA-476 and 731-TA-U79 (Final),
USITC Pub. 4278 (Nov. 2011) p. 27 ("[p]ricing data reported by
these firms accounted for approximately . . . 14 percent of U.S.
shipments of imports from subject producers in [the PRC] in 2010");
<u>Aluminum Extrusions From the PRC</u>, Inv. Nos. 701-TA-475 and
731-TA-1177 (Final), USITC Pub. 4229 (May 2011), p. 22 ("[p]ricing
data reported by these firms accounted for approximately four
percent of 2010 U.S. shipments of subject imports from [the PRC]").

importer data exceeds the comparable "traditional" data for six out of ten pricing products and that the volume of imports from Japan, Poland and Russia covered by the direct importer data likewise exceeds the comparable traditional pricing data.

The defendant maintains that the plaintiffs are improperly asking the court to substitute judgment for it on such matters. E.g., Defendant U.S. International Trade Commission's Opposition to Plaintiffs' Motion for Judgment on the Agency Record ("Defendant's Response") at 21, referencing Co-Steel Raritan, Inc. v. Int'l Trade Comm'n, 357 F.3d 1294, 1309 (Fed.Cir. 2004) (the "court is not empowered to substitute its judgment for that of the agency"), and Nippon Steel Corp. v. Int'l Trade Comm'n, 345 F.3d 1379, 1381 (Fed.Cir. 2003) ("[u]nder the statute, only [ITC] may find the facts and determine causation and ultimately material injury"). Indeed, the appellate court has recognized that it is neither "surprising nor persuasive" that parties plaintiff are able to point to "evidence of record which detracts from the evidence which supports [ITC]'s decision" or can "hypothesize a reasonable basis for a contrary determination", Matsushita Elec. Indus. Co. v. United States, 750 F.2d 927, 936 (Fed.Cir. 1984), and the Commission here maintains that it "properly relied on price comparisons that reflected equivalent stages of trade" as the "best

information of record", that the traditional data included end-user overage, and that "inclusion" of the importer data in accordance with plaintiffs' arguments merely increases the amount of subject import pricing data in percentage terms but does not render unreasonable ITC's "reliance on data showing head-to-head competition between domestic and imported products."  Defendant's Response at 4, 25.

It has long been the rule that ITC's determinations must take "into account the entire record, including whatever fairly detracts from the substantiality of the evidence"[7], and plaintiffs' arguments do not, to this point, precisely show what it is about the direct importer data that "fairly detracts" from ITC's reliance upon the traditional importer data in making its determination. The plaintiffs have recast the record to their liking, but it can not be concluded therefrom that the agency has not taken into account the entire record or that its apparent assignment of less weight to the direct importer data was unreasonable.  As the

_____

[7] _Atlantic Sugar_, _supra_, 744 F.2d at 1562 (footnote omitted).  For example, the direct importer data, covering approximately [[  ]] percent of U.S. producers' shipments, would also seem to have resulted from a form of "head-to-head" competition.  Nonetheless, ITC's "presumptive awareness" is of ABB Inc.'s position of paying "premium" prices for domestic sources, which appears to be indication of willingness to engage in less "vigorous" competition.

defendant points out, the traditional pricing data encompass the
majority of pricing data from four subject countries and at least
some of the data from all countries, and plaintiffs' own
calculations show that the subject import volumes for pricing
products *1a*, *1b*, and *2b* remain "relatively" low even when the
direct import pricing data are included.  It points out there are
no product *1a* direct imports, product *1b* would show relatively few
short tons among the aggregated direct import and traditional
pricing data as compared to the short tons of domestically produced
product, and similarly for pricing product *2b*, i.e., imported
versus domestically produced short tons, respectively.  Compare
Plaintiffs' Memorandum of Law at 23 with Staff Report, Tables V-2,
V-3, V-5.

        Having acknowledged "lower prices are prevalent in the
price comparisons", ITC concluded that the "few" direct purchases
by end users as compared with their traditional pricing data
counterparts could not have led the prices of the domestic like
product downward.  This court is not positioned, by law, to
overturn valid Commission factual findings or its reasonable
conclusions based thereon.  See 19 U.S.C. §1516a(b)(1)(B)(I).  For
that matter, contrary to plaintiffs' argument, the significant
underselling that the direct importer data further reveal (in

addition to that already indicated by the traditional pricing data)
does not "readily explain the pricing declines experienced by
domestic producers for those products."[8]

(ii)

        The plaintiffs stress that ITC did not discuss product *3a*
at all[9], a product that accounted for the second highest volume of
the ten pricing products and a greater volume than any of the three
products identified in the <u>Views</u> as reflecting "a significant
amount of competition between the domestic like product and the
subject imports" but which price declines ITC found to have been
"comparable to the decrease in raw material costs." <u>Views</u> at 37.
The plaintiffs point out that the decline in domestic industry
prices for product *3a* was nearly [[   ]] times larger than those
declines for products *2a*, *4b*, and *5b* and that the absolute volume
of subject imports under product *3a* was nearly [[    ]] as great

---

        [8]  Plaintiffs' Memorandum of Law at 26.  To support their
argument, the plaintiffs also tabulate the degrees of underselling
reflected in the direct importer data.  <u>See</u> <u>id</u>. at 27, referencing
<u>Staff Report</u>, Appx. D.  ITC is presumed, however, to have taken
such information into account.

        [9]  The plaintiffs also complain of a lack of discussion of
pricing product *3b*, but they focus their discussion on pricing
product *3a*.
        The defendant draws attention to the fact that the
volumes for *3b* are "quite small", and "the margins of overselling
significantly outweighed the margins of underselling." Defendant's
Response at 36 n. 30, referencing <u>Staff Report</u>, Table V-7.

as the volume for *2a* and approximately three times as high as the

volumes of products *4b* and *5b* reflected in the traditional importer

pricing data.

        The defendant responds that it did not ignore detracting

evidence; the Commission's discussion, verbatim, of price declines

is as follows:

> <u>Some</u> of the pricing comparisons, <u>such</u> <u>as</u> for pricing
> products 2a, 4b, and 5b, involve volumes of subject
> imports that compete directly with the most comparable
> domestic like product.  Other pricing comparisons, <u>such</u>
> <u>as</u> for pricing products 1a, 1b, and 2b, involve far
> smaller volumes of subject imports.

<u>Id</u>. at 35-36 (emphasis added).  In other words, it

> did not state that these particular correlations applied
> to all 10 pricing products.  What is evident from what it
> did state is that it examined all the pricing products
> and found certain correlations and trends with regard to
> specific products that indicated that subject imports
> were not the cause of the domestic industry's declining
> prices.  Given that the evidence pertaining to most of
> the pricing products demonstrated these trends and
> correlations, [it] was not obligated to explain away a
> correlation with respect to one pricing product out of
> 10.

Defendant's Response at 35-36.

        The plaintiffs reply that product *3a* is precisely the

"one pricing product out of 10" that contradicts the majority's

conclusion that the pricing products with the highest volumes of

subject imports had the smallest price declines.[10]  They aver that

the price declines they suffered on product *3a* were highly

significant between the first quarter of 2011 and the first quarter

of 2014,[11] and that the pricing information therefor "directly

contradicts" ITC's analysis of products *2a*, *4b* and *5b*, on which it

also found "there was a significant amount of competition between

the domestic like product and subject imports" and upon which ITC

relied "so heavily" in concluding there was no connection between

the price declines suffered by the domestic industry and the

subject imports.[12]  The plaintiffs argue the absence of any

---

[10]  The plaintiffs contend product *3a* reflected the highest
volume of subject imports in direct competition with the comparable
domestic industry product of any of the products in the traditional
importer pricing database on which the ITC majority based its
pricing analysis. Subject imports of this product accounted for
fully [[ ]] percent of the total volume of all cumulated subject
imports.  See Plaintiffs' Memorandum of Law at 23.  In their
opinion, subject import volumes of product *3a* were significant in
absolute volume and in relation to domestic consumption thereof,
with a total subject import volume of [[ ]] short tons as compared
to total domestic producer shipments of [[ ]] short tons, i.e.,
[[ ]] percent of domestic consumption of the product. See Staff
Report at V-10. Further, they argue underselling by the subject
imports of pricing product *3a* was predominant, occurring in a
majority of possible comparisons.  See id. at V-13.

[11]  See Staff Report at V-13 and V-27.

[12]  I.e., because price declines for products *2a*, *4b* and *5b*
were "comparable to the decrease in raw material costs." Views at
37. See Plaintiffs' Reply at 11. They emphasize that the decline in
the domestic industry's prices for product *3a* was nearly two times
larger than those for products *2a*, *4b* and *5b*, and the absolute
(continued...)

discussion of import volumes and pricing trends for product *3a* in the <u>Views</u> majority opinion amounts to "a grievous oversight indicative of an unwillingness to consider evidence detracting from its finding that the subject imports were not a cause of the price depression suffered by the domestic industry." Plaintiffs' Reply at 11-12.

The plaintiffs further contend that, for the defendant to respond that it "did not state that these particular correlations applied to all 10 pricing products" but that it nevertheless "examined all the pricing products and found certain correlations and trends with regard to specific products that indicated that subject imports were not the cause of the domestic industry's" declining prices amounts to <u>post</u> <u>hoc</u> rationalization. <u>See</u> <u>Usinor Industeel S.A. v. United States</u>, 26 CIT 467, 478 (2002) ("'[w]here an explanation is lacking on the record, <u>post</u> <u>hoc</u> rationalization for [the Commission's] actions is insufficient' and remand may be appropriate for further explanation") (quoting <u>The Timken Co. v. United States</u>, 20 CIT 1115, 1118, 937 F.Supp. 953, 955 (1995)).

---

[12] (...continued)
volume of product *3a* imports was nearly twice as great as the volume for product *2a*, and approximately three times as high as the volumes for *4b* and *5b* in the traditional importer pricing data. Plaintiffs' Memorandum of Law at 23, referencing <u>Staff Report</u>, V-27.

They claim the defendant discusses only the pricing products that fit within ITC's conclusions and fails to address the pricing products that do not.

This court cannot concur that the defendant goes beyond clarification into the realm of new rationale, and plaintiffs' overall presentation on this point does not demonstrate or persuade that the Commission's determination is either unsupported by substantial evidence or not in accordance with law. It did not conclude that all pricing products with the highest volumes of subject imports had the smallest price declines and <u>vice</u> <u>versa</u>, it identified three products with the most substantial price declines and three products in which there had been a significant amount of competition, with price declines that ITC further found comparable to the percentage decrease(s) in raw materials costs. It therefore concluded there was a lack of correlation among all such data between price declines and imports.

ITC's conclusion is not unreasonable, and plaintiffs' arguments on this issue do not persuade that the Commission has "entirely failed to consider an important aspect of the problem" within the meaning of <u>Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co</u>., 463 U.S. 29, 43 (1983). That is, ITC's presumptive interpretation of the record <u>as</u> <u>a</u> <u>whole</u> does not appear inaccurate

or unsupported by the substantial evidence of record even in the absence of explication on the subject of product *3a* in isolation. Here again, plaintiffs' argument is essentially for the court to substitute its judgment for that of the agency on the matter, which cannot occur in accordance with the standard of its judicial review. See Universal Camera Corp. v. NLRB, 340 U.S. 474, 488 (1951) ("as to matters . . . requiring expertise a court may [not] displace the [agency]'s choice between two fairly conflicting views, even though the court would justifiably have made a different choice had the matter been before it de novo").

Because the Commission "'is presumed to have considered all of the evidence on the record,'" it is "'not required to explicitly address every piece of evidence presented by the parties'" during an investigation. Nucor Corp. v. United States, 28 CIT 188, 234, 318 F.Supp. 2d 1207, 1247 (2004) (quoting USEC Inc. v. United States, 34 Fed.Appx. 725, 730-31 (Fed.Cir. 2002)). Instead, it need only address the "issues material to [its] determination" so that the "path of the agency may reasonably be discerned." Statement of Administrative Action for the Uruguay Round Agreements Act, H.R. Rep. No. 103-316, vol. I, at 892 (1994). On the particular point raised here, the plaintiffs do not persuade

that expanded discussion addressing the data for product *3a* is "material" to ITC's overall price effects analysis.

(iii)

        The plaintiffs next contest ITC's position on underselling, namely that it "reasonably found the significance of [the] underselling to be mitigated by the lack of significant impact on the domestic industry's market share, as the domestic industry lost only [[ ]] percentage points of market share during the [POI]". Defendant's Response at 2. They argue that nowhere in its analysis does ITC consider the domestic industry's statements concerning its strategy of holding market share and lowering its prices to meet lower-priced competition from subject imports, and that what reasoning ITC does offer is circular, essentially writing the price effects analysis requirement out of the statute:

> If Congress had wanted ITC never to reach an affirmative injury determination unless the subject imports demonstrated a <u>significant</u> market share impact, it would have written the law to make the market share impact a necessary prerequisite to proceed to a price effects analysis. The statute, however, is not written in this manner. Rather, the volume and price impact analyses are equal and coextensive elements of the law, and require ITC to take into account such circumstances, as demonstrated by the record, where domestic producers lowered prices rather than cede market share.

Plaintiffs' Reply at 12-13 (emphasis in original), referencing

Sioux Honey Ass'n v. Hartford Ins. Co., 672 F.3d 1041, 1052

(Fed.Cir. 2012) ('"[i]t is a long-held tenet of statutory

interpretation that one section of a law should not be interpreted

so as to render another section meaningless'") (quoting Princess

Cruises, Inc. v. United States, 201 F.3d 1352, 1362 (Fed.Cir.

2000)).  Similarly, the plaintiffs contend defendant's assertion

that ITC's "analysis of lost sales and revenues responses was

likewise reasonable, particularly given that there were no shifts

in market share"[13] implies that a decline in domestic industry

market share is a necessary precursor to any assessment of the

price effects of the subject imports. This reasoning, the

plaintiffs argue, once again effectively writes out the price

effect section of the statute, as it reflects an assumption that

market share impact is a threshold issue. And, ironically, the

plaintiffs further point out, ITC did find the volume of subject

imports "significant in absolute terms and relative to consumption

in the United States"[14], but found that the lack of a shift in

market share away from the domestic industry indicated that no

price impact was evident.  The plaintiffs argue ITC must explain

---

[13]  Defendant's Response at 5.

[14]  Id. at 15.

why a lack of market share shift is evidence of no negative price effects where domestic producers lowered prices to protect market share.

From this court's perspective, the main problem with such argument is that, notwithstanding the <u>Views</u>' regard of relatively stable market share as indicating "mitigation", the <u>Views</u> do not unequivocally indicate treatment of market share as a prerequisite or precursor to determining material injury.  Market share is, of course, but one of many factors the Commission evaluates in order to determine "impact", 19 U.S.C. §1677(7)(C)(iii), and it is, of course, also further directed to consider in its evaluation of "price" whether "the effect of imports of such merchandise otherwise depresses prices to a significant degree or prevents price increases, which otherwise would have occurred, to a significant degree"[15], but finding the existence of domestic industry price reduction(s), in order to maintain market share, is not, <u>ipso</u> <u>facto</u>, necessarily indicative of material injury "harm" within the meaning of the statute, as there may be "such other economic factors as are relevant to the determination regarding whether there is material injury by reason of imports" that bear on

_____

[15]  19 U.S.C. §1677(7)(C)(ii)(II).

the analysis of a given situation.  19 U.S.C. §1677(7)(B)(ii).  The
Views' reference to "mitigation" and a lack of market share shift
must be regarded in the context of the other economic factors ITC
considered as present in the investigation, in particular the
decreases in capacity utilization from the "systemic" shocks that
both plaintiffs experienced during the POI, and not solely with
regard to subject imports.  See Views at 37-40.

### (iv)

      The plaintiffs devote much of their briefs arguing
against ITC's reasoning on the products' price declines.  See,
e.g., id. at 44 ("[t]he price declines . . . were a result of lower
raw materials prices, unused capacity and intra-industry
competition").  The phrase "intra-industry competition" is found
only once, but, as a matter of the record and ITC's conclusions, it
dominates the Views.

      The plaintiffs advance numerous lines of attack thereon,
none of which prove availing.  They acknowledge that, if
high-permeability GOES is priced low enough, it may be used in
place of conventional product in certain applications.  However,
they argue, the reverse is not true, at least for certain
applications[16], and given that demand for high-permeability GOES

---

      [16]  See Views at 29 n. 105.

increased significantly during the POI, largely due to higher efficiencies mandated by the U.S. government for power transformers, they contend that "one would [have] expect[ed] to see prices obtained by the sole domestic producer to be increasing", which was not the case.

Considering the record as a whole, ITC concluded <u>why</u> that was not true. <u>See</u> <u>Views</u> at 37 ("[t]he change in these prices was comparable to the decrease in raw material costs" and "[d]ecreasing capacity utilization[ ] contributed to the declines in prices for domestically produced products") (footnote omitted). Contesting that conclusion, the plaintiffs here contend that the <u>Views</u> glide over the fact that only AK Steel produced the high-permeability products *4b* and *5b* and that intra-industry competition was therefore not a factor in the declines in the prices for those products[17], and that pricing information thereon demonstrates that subject imports had significant price effects.

Critical of defendant's response, p. 36, that "[r]esting the pricing analysis on a product manufactured by only half of the

---

[17] During the POI, Allegheny Ludlum had only made substantial investments in research and development of high-permeability GOES but not in commercial-quantity production thereof. <u>See</u> Transcript of ITC Hearing on July 24, 2014 (hereinafter "Tr."), PDoc 184, at 28.

domestic industry when the record contains pricing data pertaining
to the industry as a whole would run counter to this mandate", the
plaintiffs argue such reasoning is "confounding" because ITC has
never limited its pricing analysis to those products that are made
by all members of the domestic industry, and it is those exact
products (*4b* and *5b*) on which it rests "so much" of its pricing
analysis and its conclusion that the pricing products with
relatively high import levels showed relatively low price declines.

     ITC's defense (as paraphrased by the plaintiffs) is that,
despite increased demand for products *4b* and *5b*, and despite
falling prices therefor, and also absent "intra-industry"
competition therefor, ITC recognized that prices declined during
the POI "for all domestically produced pricing products"[18] (which
obviously included products *4b* and *5b*), and that such declines were
due to (1) the domestic industry's declining exports of GOES; (2)
knowledge by U.S. purchasers of excess U.S. industry capacity; (3)
Allegheny Ludlum's loss of a contract with a large purchaser; and
(4) decreased raw materials costs.  See Defendant's Response at 37,
quoting Views at 35.

_____

     [18] Plaintiffs' Reply at 15, quoting Defendant's Response at
31 (court's limitation of quoted passage).

The plaintiffs argue "each"[19] of the above explanations is not supported by substantial evidence.  <u>See</u>, <u>e</u>.<u>g</u>. Plaintiffs' Memorandum of Law at 42-49.   They begin by contending ITC "determined" that competition between Allegheny Ludlum and AK Steel for the business of Howard Industries "resulted" in the significant declines in prices at which the domestic industry was able to sell GOES in the U.S. market during the POI.  They claim "intra-industry competition" could not have been the sole or even a primary cause of U.S. price depression because Allegheny Ludlum did not produce high-permeability GOES during the POI, and because AK Steel, the only domestic producer of such GOES, would have had every motivation to negotiate for the highest price possible for that product, such that the only price competition that would have motivated AK Steel to reduce its prices for high-permeability GOES must have resulted from the other sources that produced these products, namely, imports of high-permeability GOES from Japan, Korea, and the PRC.  They charge the <u>Views</u> with glossing over the information on the record of the prices at which Howard Industries purchased GOES during the POI as well as the circumstances of the expiration of its contractual arrangement with Allegheny Ludlum at

---

[19]  Noteworthy here is that plaintiffs' briefing does not address the domestic industry's declining exports of GOES during the POI.

the end of 2012, which involved Howard Industries countering a price offer from AK Steel for purchases in 2013 with lower priced subject imports, all of which demonstrates that the prices at which Howard Industries purchased GOES was not and could not have been affected by competition between Allegheny Ludlum and AK Steel.

The plaintiffs also contend defendant's response raises a number of points that are incorrect.  First, in reply to its response that they seem to "question the notion that there was intra-industry competition between the two domestic producers", the plaintiffs contend their argument is not that there was no intra-industry competition in general, but that the facts of record do not establish that there was any significant intra-industry competition between them for Howard Industries' business.[20]   They

---

[20]   In a footnote, the plaintiffs further complain of ITC's response quoting the testimony of an Allegheny Ludlum official for the proposition that his company and AK Steel "compete vigorously", but without quoting testimony by this same official and by his counterpart at AK Steel that identified unfairly traded subject imports as the cause of significant price declines in the U.S. market. See, e.g., Tr. at 30, PDoc 184 (stating that Allegheny Ludlum was "confronted with very low priced imports as early as 2011, well before our loss of Howard Industries' business in 2013" and that the company was "able to earn a reasonable return . . . until the low-priced imports entered the market and caused devastating declines in pricing") (testimony of Mr. Polinski); id. at 24-25 ("[w]hile our company competes aggressively with Allegheny Ludlum, our sales staff has been told repeatedly by customers that we must lower our prices in order to retain their business, or they
(continued...)

further contend defendant's response is ironic, given that the only example in the <u>Views</u> of intra-industry competition cited is over the Howard Industries account.

Second, the plaintiffs contend that defendant's response, as with ITC analysis in its administrative proceedings, errs in attributing any of the declining prices at which Howard Industries purchased GOES to competition between Allegheny Ludlum and AK Steel. <u>See</u> Defendant's Response at 39 (quoting <u>Views</u> at 38-39). <u>See also</u> Response Brief of intervenor-defendant ABB Inc. ("ABB's Response") at 13; JFE/NS&SM Opposition at 31-34; and Response Memorandum of intervenor-defendant ThyssenKrupp Electrical Steel GmbH at 6. Defendant's response attributes declines in prices paid by Howard Industries for GOES purchased from Allegheny Ludlum between 2011 and 2012 to intra-industry competition.[21]  The

_____

[20]  (...continued)
will purchase lower-priced imported GOES from the subject countries") (testimony of Mr. Petersen of AK Steel).

[21]  The plaintiffs also complain of ITC's attribution of price declines to "widespread knowledge" among U.S. purchasers of the domestic industry's excess capacity, which it concluded allowed the purchasers to negotiate lower prices. <u>See</u> <u>Views</u> at 39. The plaintiffs contend the only credible record evidence cited by ITC in support of "widespread" knowledge is the testimony of a single industry witness. Thus, they argue that, while ITC also cites the testimony of a consultant retained by a Japanese producer for ITC's investigation, his testimony "makes clear" it is based on speculation and not personal knowledge. <u>See</u> Plaintiffs' Memorandum of Law at 53-54.

plaintiffs state that Allegheny Ludlum's pricing during that period was set by a long-term contract and, thus, Allegheny Ludlum had no reason to (and did not) negotiate lower prices with Howard Industries in response to purported competition from AK Steel. See Plaintiffs' Memorandum of Law at 43-45 (emphasis added). Accordingly, they contend record evidence does not support ITC's determination that the declines in prices at which Howard Industries purchased GOES between 2011 and 2013 were due to competition between Allegheny Ludlum and AK Steel for that account. Further, the plaintiffs point out, ITC's Views do not identify a single other instance of intra-industry competition that purportedly drove down prices in the U.S. market.

     Summarizing, the plaintiffs maintain that while Howard Industries is a significant purchaser of conventional GOES, ITC's "failure" to identify "any other evidence in support of the intense intra-industry competition that purportedly drove down market prices demonstrates its finding is not supported by substantial evidence." Plaintiffs' Reply at 18-19 & n. 27.

     Third, in regard to defendant's response that "whether or not the two companies believed they were competing with one another for Howard Industries' business is beside the point," because ITC

"was focused on what transpired with respect to prices", the plaintiffs reply that this statement significantly departs from the analysis in ITC's <u>Views</u>, which attributes the declining prices for GOES over the period of the competition between the two domestic producers. <u>See</u> <u>Views</u> at 39 (attributing the decline in prices that Howard Industries paid for GOES over the POI to "increased competition between domestic producers"). They argue this amounts to a "retreat" from ITC's findings during the underlying administrative proceedings and reflects the lack of substantial evidence supporting that finding.

        Fourth, the plaintiffs contend that, in seeking to identify some record evidence to support ITC's conclusion that intra-industry competition was the cause of the declining prices at which Howard Industries purchased GOES during the period, the defendant states that the plaintiffs do not contend that AK Steel had no reason to lower its prices. Defendant's Response at 40. To the contrary, the plaintiffs contend, they explained to ITC that AK Steel lowered the prices it offered to Howard Industries in 2013 in response to lower priced imports. <u>See</u> Plaintiffs' Memorandum of Law at 46, discussing the declaration of one [[          ]] of AK Steel, who was personally responsible for negotiating the contract under which AK Steel sold GOES to Howard Industries in 2013, and

citing the petitioners' July 31, 2014 Post-Hearing Brief, Ex. 7 at 16, CDoc 218, PDoc 200.  The defendant asserts the information in that declaration is inconsequential.  The plaintiffs disagree, claiming it is the only information on the record that specifically addresses why AK Steel lowered the prices at which it sold GOES to Howard Industries in 2013.  <u>See</u> Petitioners' July 31, 2014 Post-Hearing Brief, Ex. 7 at ¶6, CDoc 218, PDoc 200.  As such, they contend, "there is no record information to support a conclusion that the decline in prices in 2013 at which AK Steel sold GOES to Howard Industries was due to anything other than subject imports", leaving unsupported by substantial evidence the Commission majority's conclusion that the decline was due to intra-industry competition.

Fifth, the plaintiffs argue that the explanation in defendant's response for why ITC accorded little weight to the [[         ]] declaration mischaracterizes its analysis.  In particular, defendant's response asserts that it "explained that there was contradictory evidence in the record" and that it "found other evidence . . . to outweigh the declaration, which was reasonable, and is supported by substantial evidence."  Defendant's Response at 41 n. 36.  The plaintiffs argue these statements are

inconsistent with the <u>Views</u>.  In its entirety, the plaintiffs point

out the discussion therein of the [[      ]] declaration states:

> [<u>S</u>]ee <u>also</u> Petitioners' Posthearing Brief, Exh. 1 at 48
> (petitioners claim Howard Industries used its knowledge
> of low import pricing to leverage down AK Steel's
> contractual prices). This claim was based on a
> confidential declaration. As such, it cannot be verified
> as Commission staff attempts to do with "lost revenue"
> allegations.

<u>Views</u> at 40 n. 148.  Thus, the plaintiffs argue, contrary to the

representations in defendant's response, the <u>Views</u> do not state

that other record evidence outweighs the [[      ]] declaration,

much less cite to or even reference any such record evidence. They

contend, as argued above, that ITC could not have cited any such

record information because there is none that contradicts that

declaration's explanation of the circumstances that resulted in AK

Steel's decision to lower the prices at which it sold GOES to

Howard Industries in 2013.

     Sixth, the plaintiffs contend that the defendant also

mischaracterizes ITC's finding regarding U.S. purchasers

identifying AK Steel and Allegheny Ludlum as "price leaders".  They

argue that ITC misinterpreted the purchasers' responses in

concluding that the domestic industry was "responsible" for leading

prices down for GOES in the U.S. market.   <u>See</u> Plaintiffs'

Memorandum of Law at 49-52.  The defendant counters that "ITC did
not presume that prices moved in any particular direction -- up,
down, or remained stable when it summarized the questionnaire
responses as indicating the domestic producers were the price
leaders". Defendant's Response at 43. <u>See</u> <u>also</u> JFE/NS&SM Opposition
at 28-29. The plaintiffs claim that the Commission <u>Views</u> contradict
this statement: "We find such widespread knowledge of existing
domestic unused capacity enabled purchasers to obtain lower prices.
<u>These observations are consistent with evidence in the record that</u>
<u>the domestic producers are the price leaders in the industry</u>."
Plaintiffs' Reply at 21, quoting <u>Views</u> at 39-40 (plaintiffs'
emphasis).   Thus, they claim, contrary to the suggestion in
defendant's response, the <u>Views</u> make clear the agency's conclusion
that the domestic industry -- as purported price leaders -- was
responsible for leading prices for GOES in the U.S. market
downward.   To the contrary, the plaintiffs continue, ITC's
questionnaire makes clear that a "price leader" is not necessarily
the lower-priced supplier, and other statements made by purchasers
demonstrate that they identified the domestic producers as "price
leaders" based on their efforts to increase the prices at which
GOES was sold in the U.S. market.

Seventh, the plaintiffs emphasize that the price declines on products *4b* and *5b* during the POI far exceeded the declines in raw materials costs therefor.  Indeed, they stress that ITC stated that those products showed "a significant amount of competition between the domestic like product and the subject imports", <u>Views</u> at 37, and they object to ITC's conclusion that the declines in the pricing products (at least for *2a*, *4b*, and *5b*) were attributable to declines in raw material prices rather than subject imports.  <u>See</u> Plaintiffs' Memorandum of Law at 36-37.

Here, assuming that delving further into this point might assist the reader's understanding, it should be recalled that ITC observed that prices for products *2a*, *4b*, and *5b* declined, while the cost of raw materials used to produce one ton of GOES decreased on average by a comparable percentage.  <u>See</u> <u>Views</u> at 37. The plaintiffs argue that, while the percentage declines in product pricing may have been similar to the decline in raw materials costs, examination of the record shows that the absolute price declines far exceed the decline in raw materials costs.  Raw material costs declined by [[ ]] per ton between 2011 and 2013, while U.S. prices for the three pricing products fell between [[ ]] per ton and [[ ]] per ton during the same period, and the average unit value of U.S. shipments declined by [[ ]] per short ton.  <u>See</u>

Plaintiffs' Memorandum of Law at 37; Staff Report at C-4, V-15, V-16, and V-27. The plaintiffs point out that the decline in domestic producer prices for products *4b* and *5b* was greater than was justified by the decline in raw materials costs, and they claim the "causal connection" to subject imports is demonstrated by the underselling data itself, which show underselling in comparisons for product *4b* and for product *5b* in the traditional pricing data, as well as in 6 of 13 comparisons for product *4b* and 11 of 15 comparisons for product *5b* in the direct importer data. See Staff Report, V-15, V-16, and Appx. D, D-13 and D-15. And, noting defendant's response that the plaintiffs cannot "choose" which methodology (e.g., absolute basis) ITC uses in its analysis and that it is free to choose its own methodology so long as it is reasonable[22], the plaintiffs counter in their reply that the [[ ]] decline in raw material costs accounts for just 13 to 17 percent of the price declines for the products under review.

Eighth, the plaintiffs argue that, although defendant's response relies on ABB's assertions that it "negotiates its sales with U.S. producers well before it negotiates sales with its

---

[22] Defendant's Response at 34 (maintaining that the plaintiffs "simply assert that [ITC] should choose calculations for its analysis that are more favorable to the outcome they would like").

foreign suppliers" in support of ITC's conclusion that "subject imports of pricing products *4b* and *5b* did not lead domestic prices downward," it is clear from the record that ABB purchased subject imports of products *4b* and *5b* that undersold the prices it paid to the domestic industry in 16 of 26 comparisons. They contend that, even though the Japanese respondents asserted that their heat proof, high-permeability products *4a* and *5a* are superior to the high-permeability products offered by AK Steel (and should thus have commanded a premium), the prices paid by ABB for those products were less than the prices ABB paid for domestic non-heat-proof GOES products *4b* and *5b* in every single comparison during the POI.  See Staff Report, D-12 to D-15.

Considering the foregoing, it is plain from the Views and Staff Report that ITC found various factors apart from import underselling that were behind the domestic industry's product pricing.  It fairly recognized that "[p]rices declined during the [POI] for all domestically produced pricing products", Views at 35, and determined that the factors behind the decline(s) were (1) the large decline in the domestic industry's exports, (2) the widespread knowledge of the resulting unused capacity, (3) Allegheny Ludlum's loss of a contract with a large purchaser, and (4) decreased raw material costs, id. at 35-40.  It also examined

the traditional pricing data to observe that prices for Japanese
product *4a* are higher than domestic prices for product *4b*, Staff
Report, Table V-8; it observed that ABB negotiates its purchases
with U.S. producers well before it negotiates with foreign
suppliers; and it noted that the vast majority of direct imports
for products *4b* and *5b*, see id., Tables D-2 to D-7, indicated to
ITC that subject imports of those products did not lead domestic
prices downward.  ITC pointed to purchaser response to explain its
conclusions on price leadership, Views at 40 n. 149, and the
breadth of knowledge it imputed to purchasers regarding the
domestic industry's unused capacity, id. at 39 (see also Transcript
of ITC Preliminary Hearing on Oct. 25, 2013, PDoc 67, at 120-21:
"everyone in the industry knows the two reasons why domestic prices
are falling" et cetera), and ITC is, as it states, "required to
assess the domestic industry as a whole", Defendant's Response at
36, referencing Committee for Fair Coke Trade v. United States, 28
CIT 1140, 1167 (2004).  Plaintiffs' arguments raised on the
apparent issue(s) here do not persuade that ITC has not done so, or
that its analysis thereof can be held unreasonable, or that the
record does not substantiate its four conclusions above.  Thus,
notwithstanding plaintiffs' attempt to focus "intra-industry
competition" on Howard Industry's purchases over the POI and/or the

pricing of products *4b* and *5b*, it cannot be concluded that the
Views' overall assessment of domestic competition during the POI is
unreasonable or unsupported by substantial evidence on the record.

### (v)

         Lastly, with respect to their contention that ITC's price
effects analysis is unsupported by substantial evidence, the
plaintiffs argue that the record does not support its findings
regarding lost sales and revenues and that the Commission failed to
address substantial issues they raised.

         In making its price effects finding, ITC stated that,
"[w]hile there are confirmed lost sales and revenues, they are of
minor magnitude and do not outweigh other data in the record
showing the lack of significant price effects." Views at 41
(footnote omitted). ITC counted as confirmed only those lost sales
and revenues allegations that purchasers explicitly admitted. See
Staff Report, Table V-12. "The confirmed lost sales do not detract
from our analysis, as there were no shifts in market share as
discussed above." Id. at 41 n. 15 (finding two confirmed lost
sales allegations totaling [[$          ]] and three confirmed
lost revenue allegations totaling [[$          ]]).

The plaintiffs argue ITC failed to analyze reasonably the responses to the domestic industry's lost sales and revenue allegations. Plaintiffs' Memorandum of Law at 55-67. They contend it could not simply examine whether responding purchasers "agreed" or "disagreed" with the allegation, because certain purchasers only "denied" lost sales and lost revenue allegations on "technical" grounds, based for example on a minor factual dispute, but the record contains numerous instances of purchasers otherwise conceding having purchased a lower-priced imported product or using a lower price offer for subject imports to force domestic producers to lower their price to secure a sale.   See id. at 56, citing Petitioners' Pre-Hearing Brief at 39-45, CDoc 203, PDoc 175; Tr. at 47, 133-34, PDoc  184; Petitioners' Post-Hearing Brief, Ex. 1 at 9-14, 44-49, CDoc 218, PDoc 200.

As exemplar, the plaintiffs point to ABB's response brief where it "unequivocally denied Plaintiffs' lost sales allegations." ABB's Response at 9.  They reply that, although ABB claims to have "disagreed" with the lost sales allegations, [[

]].  <u>See</u> Plaintiffs' Memorandum of Law at 58-60.

All told, the plaintiffs argue the record evidence demonstrates that [[ ]] percent (by value) of the domestic industry's lost sales allegations that received a response should be considered confirmed, and that [[ ]] percent (by value) of its lost revenue allegations that received a response should be considered confirmed, on the assumption (or presumption) that a purchaser would make the strategic decision not to support the domestic industry's case by confirming such allegations. <u>See</u> <u>id</u>. at 65.  Based on this analysis, the plaintiffs contend the confirmed lost sales allegations should total [[$                ]] and the confirmed lost revenue allegations should total [[$        ]]. <u>Id</u>.  They add that these figures do not include a significant number of allegations where the purchasers did not respond to ITC's request for information, which, if included, would increase the total lost sales figure to [[$            ]] and the total lost

revenues figure to [[$          ]] - or a total of [[$

     ]].  <u>Id</u>. at 65-66.


          The plaintiffs further add that a certain footnote to the

lost sales and revenue summary table in ITC's <u>Staff Report</u> confirms

an administrative failure to meaningfully evaluate the responses

received to ITC's lost sales and lost revenue questionnaires

because it states: "[t]his column is not a staff assessment of

whether the purchaser comments agree or disagree; rather, it is

only reporting whether the purchaser wrote agree or disagree and

comments on the allegations."  <u>Staff Report</u> at V-38.


          Defendant's response, the plaintiffs further contend,

does not in any manner address the substance of their arguments but

asserts they are merely seeking to have the court "reweigh" the

evidence on lost sales and revenues[23].  To the contrary, the

_____

          [23] The plaintiffs claim defendant's response minimizes the
significance of the domestic industry's lost sales and lost revenue
allegations, stating that even if all of the allegations were
accepted as true, they would amount to just [[   ]] percent of the
domestic industry's total shipments of GOES during the period, and
that "[t]hese totals hardly outweigh the other evidence in the
record that ITC considered and explained. Defendant's Response at
48.  <u>See</u> <u>also</u> <u>id</u>. at 49 ("[t]hus, even if all lost sales and
revenue allegations were confirmed, substantial evidence supports
ITC's findings based on the evidence to which ITC gave the most
weight").  Here again, the plaintiffs charge the defendant with
<u>post</u> <u>hoc</u> rationalization, as they claim the Commission did not
complete such an analysis in the underlying investigation.

plaintiffs claim, they seek the court's requiring ITC "for the first time" to consider extensive argumentation made by the domestic industry on three separate occasions in ITC's final phase investigation but that remained completely unaddressed in its <u>Views</u>. Although the plaintiffs interpret defendant's response as "belittl[ing]" the significance of the domestic industry's allegations, they point out that the [[$         ]] in lost revenues over the period would have more than offset the operating loss of [[$         ]] suffered by the domestic industry in 2013. The plaintiffs insist that the reduced prices that resulted from those lost sales and revenues forced U.S. producers to accept even lower benchmarks for price negotiations on future sales, resulting in an additional negative impact on the domestic industry's financial condition.

        The crux of the problem with regard to plaintiffs' arguments, however, is that they ask the court to interfere in ITC's decision to count only "confirmed" lost sales and revenues allegations. It targets what weight the agency assigns to the evidence, a matter within its discretion. While it might have been equally reasonable for ITC to presume the allegations confirmed in the absence of explicit denial as well, the court cannot conclude that ITC's requirement of explicit agreement in order to count an

allegation "confirmed" was unreasonable in accordance with <u>Consolo</u>,
<u>supra</u>, 383 U.S. at 620 ("two inconsistent conclusions from the
evidence does not prevent an administrative agency's finding from
being supported by substantial evidence").    The remainder of
plaintiffs' arguments on this issue, therefore, are unavailing.

B

The plaintiffs challenge ITC's impact analysis, which
found that, because the subject imports did not take significant
market share away from the domestic industry and did not have
significant price effects, the domestic industry was not materially
injured by reason of the subject imports:

> The domestic industry's unfavorable trends in operating
> performance were a combination of adverse output-related
> effects and adverse revenue effects. These, in turn, were
> caused by the loss of export shipments, higher unit costs
> resulting from less production, and reduced prices.
> However, none of these factors were a function of the
> subject imports.

Views at 44.

The plaintiffs contend the Commission majority improperly
applied the statute's causation standard in not finding subject
imports a cause of material injury[24], and they argue it erred in

---

[24]  They latch onto ITC's statement that the law requires it
to determine whether subject imports are "the" cause of material
injury to the domestic industry, and they argue the "by reason of"
(continued...)

attributing the domestic industry's deteriorating condition entirely to factors other than subject imports.  In addition to their arguments over alleged errors in ITC's price effect analysis, they contend it improperly attributed the domestic industry's declining performance to "higher unit costs resulting from less production" and not -- at least in part -- to subject imports. See Plaintiffs' Memorandum of Law at 70-71, quoting Views at 44.

---

[24] (...continued)
standard(s) in 19 U.S.C. §§ 1671d(b)(1) and 1673d(b)(1) do(es) not require unfairly traded imports to be the "sole" or "principal" cause of injury.  Plaintiffs' Reply at 26, referencing Nippon Steel Co. v. USITC, 345 F.3d 1379, 1381 (Fed.Cir. 2003) ("an affirmative material-injury determination under the statute requires no more than a substantial-factor showing[; t]hat is, the 'dumping' need not be the sole or principal cause of injury" and the "by reason of" standard is satisfied so long as subject imports are more than a minimal or tangential cause of injury; the existence of factors other than subject imports that may have been a greater cause of injury does not prevent an affirmative injury determination). See also Mittal Steel Point Lisas, Ltd. v. United States, 542 F.3d 867, 873 (Fed.Cir. 2008).

This court does not regard defendant's use of "the" when describing "cause of material injury" (emphasis in original) in its response brief as amounting to a misstatement of the law, since the subheading under which that statement directly appears also states that subject imports were not "a" cause of material injury.  In any event, it is the Views' statement on the subject that controls, and therein is specifically stated that "the 'by reason of' standard is satisfied if subject imports are more than a minimal or tangential cause of injury."  Views at 20 n. 71. See also JFE/NS&SM Opposition at 5-6.

More precisely, contrary to defendant's and intervenor-defendants' arguments[25], the plaintiffs contend that "higher unit costs resulting from less production" were not a significant factor in the domestic industry's declining financial performance.  They argue that, although the domestic industry's unit costs increased between 2011 and 2013, the record data show no direct correlation between declining production and increasing unit costs.  In particular, the plaintiffs emphasize that, while domestic production declined from 2011 to 2012 and from 2012 to 2013, U.S. producers' unit costs increased from 2011 to 2012 but declined from 2012 to 2013. See Staff Report, C-4.  Thus, they argue, the record does not support ITC's finding that the declines in the domestic industry's export shipments and domestic production resulted in significant cost increases that caused the industry's declining performance.

Judicial review of these types of matters, however, is ill-positioned to consider the "significance" of the data to which the plaintiffs would here point; all that may be reviewed is whether substantial evidence of record supports the determination

---

[25] See Defendant's Response at 52-53; JFE/NS&SM Opposition at 41-42; Opposition of intervenor-defendants Baoshan Iron & Steel Co., Ltd. and Baosteel America, Inc. at 39.

reached.   Nonetheless, they argue it is significant that ITC's
Staff Report attributes the domestic industry's declining
performance to the reduced prices at which it was able to sell GOES
in the United States. In particular, they point to its variance
analysis, which shows that of the [[$]] decline in the domestic
industry's operating income between 2011 and 2013, [[$]] - or [[ ]]
percent - was directly attributable to the negative effect of
decreased prices. Staff Report, VI-13.  The plaintiffs argue that
because ITC's Views do not address the variance analysis contained
in the Staff Report[26], defendant's response now, asserting that the
agency "gave less weight to the variance analysis than to the
evidence regarding the decline in export sales and Allegheny
Ludlum's loss of the Howard Industries contract"[27], is nothing more
than post hoc rationalization unsupported by the record.  Equally
unsupported, the plaintiffs continue, is defendant's assertion,
post hoc, that the variance analysis was not compelling[28] because
price was a more dominant factor between 2012 to 2013.   The
plaintiffs contend that the record shows that price variance had a
greater negative impact on the domestic industry's operating income

---

[26]   See Views at 33-44.

[27]   Defendant's Response at 53. See also JFE/NS&SM Opposition
at 43-44.

[28]   See Defendant's Response at 52.

in each year of the POI than either the cost or volume variances.
Cf. Staff Report, VI-13 and VI-14.  The plaintiffs thus claim that
ITC's failure to address the Staff Report's variance analysis,
which establishes that the decline in pricing -- not increasing
costs -- was the primary reason for the U.S. producers' financial
deterioration during the POI, represents another instance in which
the Commission failed to address record information that is
contrary to its findings and that requires a remand to the agency
for further deliberation.

        This court cannot concur with such reasoning.  ITC
acknowledged the price declines, and it found that the reasons
therefor were a result of lower raw materials costs, unused
capacity, and intra-industry competition.  Regardless of why it did
not rely on the variance analysis in its Views, the use or non-use
was matter within its discretion.  See AWP Industries v. United
States, 35 CIT ___, ___, 783 F.Supp.2d 1266, 1280 n. 35 (2011)
("[v]ariance analysis is a tool that the Commission may use during
an investigation") (emphasis added); Altx, Inc. v. United States,
26 CIT 1425, 1433 (2002) (ITC need not rely on theoretical model if
"less helpful" than other data in the record), aff'd, 370 F.3d 1108
(Fed.Cir. 2004).  And plaintiffs' arguments do not persuade that,

or explain why, reliance upon the variance analysis would have altered ITC's <u>Views</u> on the price declines in any event.

III

        In conclusion, and in view of the foregoing, the court can only observe that there is no bright line between fair and unfair competition -- each situation must be, and necessarily is, evaluated on its own merits, <u>ad hoc</u>.[29]   Here, the standard of judicial review precludes <u>de novo</u> review.  And the plaintiffs do not persuade that ITC's <u>Views</u> are either unsupported by substantial evidence on the record or not in accordance with law.  Accordingly, their motion for judgment on that record must be denied, with judgment entered dismissing their complaint.

        So ordered.

Decided:  New York, New York
          November 23, 2016

                                   /s/ Thomas J. Aquilino, Jr.
                                     Senior Judge

---

        [29]  <u>See</u>, <u>e</u>.<u>g</u>., Fed. Trade Comm'n, <u>Antidumping Legislation and Other Import Regulations in the United States and Foreign Countries</u>, S. Doc. No. 73-112 (1934) ("[d]umping has been repeatedly recognized as unfair competition in national legislation and in international conferences and agreements, although it is sometimes very difficult to draw the line between what is fair and what is unfair in foreign-trade development"); Susan Bierman, <u>Fair and Unfair Trade in an Interventionist Era</u>, 77 Am. Soc'y Int'l L. Proc. 114, 114-15 (1983) (Remarks of Seymour J. Rubin, Chairman) ("[i]t may well be that the realities of relief against injury from foreign competition blur the often indistinct line between fair and unfair trade").